Good morning, Your Honors. May it please the Court? My name is Lauren Murphy. I'm a law student at the University of Arkansas, and I'm here on behalf of the appellant, John Colwell. I'll watch the clock, but I'd like to reserve four minutes for rebuttal for my co-counsel, Mason Boling, who's also a law student at the University. So the understanding is you'll talk, you hope to reserve four minutes, but the rebuttal will belong to your co-counsel? The rebuttal will belong to my co-counsel, yes, sir. Okay, so let's reset at 10 now that we've got the housekeeping out of the way. Thank you. This prisoner's rights case concerns the continuous denial of medical treatment for Mr. Colwell's mature cataract, which has blinded him in his right eye for more than 10 years now. The district court correctly determined that Mr. Colwell suffers from a serious medical need, but the district court's decision regarding deliberate indifference is flawed, and that's for two main reasons. First, the district court mistakenly concluded that this is a mere difference of medical opinion case. And second, the district court erred in concluding that the denial of treatment resulted in no harm to Mr. Colwell. So the argument that I expect we'll hear from the other side, and I see it in the papers below and on the papers that will come to us, is he can see out of one eye. So why is that not good enough? It's not good enough because evaluating Mr. Colwell's need for surgery is not responsive to his serious medical need. Well, I guess the question is why is it a, quote, serious medical need, if that's the standard, if he can see out of one eye? The reason that Mr. Colwell's condition qualifies as a serious medical need is because under this court's decision, under McGuckin v. Smith, Mr. Colwell's condition is one that a reasonable doctor did find worthy of comment or treatment. And so under that standard, Mr. Colwell's condition is a serious medical need. That's all it takes to get a serious medical need is just worthy of comment by a doctor or worthy of treatment? Under McGuckin v. Smith, that's an example of how a serious medical need may qualify as such. And it's logical. It makes sense because there are some medical needs that don't, that aren't painful, that don't have permanent damage. If Mr. Colwell were on the outside, there's some suggestion in the record that he could have a driver's license. Is that correct? Dr. Scott at page 222 of the record actually says that based on his normal, the vision out of his normal eye, he could qualify to drive a car in many states of the U.S. And that's not every state of the U.S. It's just some states. Okay. Nothing in particular about Nevada? Nothing in particular about Nevada. Yes, Your Honor. Do we have any idea from the record whether he would qualify for Social Security disability? There's nothing in the record that discusses – Presumably, if he was able to drive in most states and would be able to work in many states, then he would not qualify for Social Security. It's a different standard, I understand. I'm just trying to figure out how serious this is. If you were on the outside, do we have anything in the record that suggests how many people sort of walk among us with a cataract? No, Your Honor. There's nothing in the record that discusses that particular condition, no. What we do have in the record is instead prison officials noting that Mr. Colwell does indeed suffer from a condition that significantly affects the quality of his life, and that's checked in the box on page 232 of the record. Because we have an aging population, this appears to be a problem that is occurring in a lot of states. We have a lot of unpublished decisions from other jurisdictions dealing with cataracts of various intensity. Do we know whether Nevada's policy, written policy, is similar to or different from other states? No, Your Honor. We aren't aware of whether or not the actual written policy, Medical Directive 106, is similar to what other states do. Admittedly, there isn't much information out there regarding, past the cases that we do cite in our briefs, regarding the policy surrounding cataract surgery. However, in this case, the Nevada Department of Corrections policy, first of all, there's no evidence in the record that that was even applied in this case. And second of all, there is evidence that that's a constitutionally defective policy, actually. This may be in the record, and I've just missed it. Why can he see out of one eye and not the other? Did he get a cataract operation on the good eye? He received a cataract operation on the left eye back in 2002, and after that surgery he immediately started to experience problems with the right eye. Do we have any evidence in the record as to whether there's a possibility he'll suffer permanent damage? No, Your Honor. There is no evidence in the record that Mr. Caldwell will suffer permanent damage. However, we would argue that refusing treatment repeatedly for 10 years has essentially left Mr. Caldwell at least indefinitely blind, if not permanently blind. Well, if he's permanently blind, then it can't be corrected, but I thought it could be corrected. It can be corrected, but insofar as the prison refuses to give medical treatment so long as the other eye is okay, Mr. Caldwell is indefinitely blind. He will be blind as long as he can see out of the other eye, and that is exactly why we in our briefs say that this is a one-eye only policy. Is Mr. Caldwell seeking anything other than damages? Injunctive relief, yes. He is seeking injunctive relief. And if there are, I'd be happy to answer further questions, but I'd also like to reserve some time. Well, I'm not sure you fully understood or answered Judge Bybee's question. We know he's seeking injunctive relief. Is he also seeking damages? Yes, yes, Your Honor. Yes, he's also seeking damages. Let me ask you this. Is there anything in the record that tells us that because he's blind in one eye, he is suffering adverse consequences in the prison now? Yes, Your Honor. There is evidence. Could you detail those? Yes, Your Honor. First of all, in Mr. Caldwell's verified complaint, there is evidence that he bumps into other prisoners, and that results in altercations. That's at page 202 and 203 in his verified complaint sworn under the penalty of perjury. Also in his deposition on several pages, pages 98 through 109, pages 119 through 125, Mr. Caldwell consistently catalogs harms such as falling onto a cement block, running into other prisoners, causing physical altercations, running his head into the bunk because he sleeps on a lower bunk. He constantly hits his head. He's also 6'7", and that may present its own problems. That's true, Your Honor. And that's a collateral issue that he probably encounters as a result of his There's some evidence that he had an accident with a sewing machine on two occasions. Yes, Your Honor. And he had been working at that job for some 10 years. Had he ever run into his fingers before? No. In fact, those two instances of running his hand through the sewing machine happened to him within the last year before he filed this lawsuit. And how long has he had the cataract? He's had the cataract since 2002. Okay, so we've got a 10-year history of having a cataract. Yes, sir. Is it marginally deteriorated in the last year that we could attribute this to the cataract as opposed to just old age, inattention, something else? Well, the running of his fingers through the sewing machine happened in 2010, and he actually sought a physical examination for his eye again in 2009 after not seeking medical attention for several years because he started Right, but if he's been effectively blind for several years but he only recently ran his fingers through, that suggests that it may be due to inattention, it may be caused by other things, aging, or other things besides the cataract. That's true, Your Honor, but there are also other documented injuries that have happened recently that he, Mr. Caldwell, in his verified complaint and deposition attributes to his cataract. So insofar as there are two ways to look at it, that's just a disputed issue of material fact. And if there are no further questions, I'd like to reserve the rest of my time for rebuttal. Thank you very much. Let's hear from the other side, and then we will allow time for rebuttal. Judge Silverman, Judge Fletcher, good morning. My name is Clark Leslie. This is Judge Bybee. Judge Silverman is still on the plane. That's it. Okay. Good morning. My name is Clark Leslie, and I'm a senior deputy attorney general from the State of Nevada. It's my privilege to represent the appellees in this matter. Several questions were raised by this Court that I think are very germane to the issue that we're trying to decide on appeal. The questions arose and included what is the current status in terms of what he can and can't do. There is no better chronicle of that than Mr. Colwell himself, who in his deposition afforded us a very clear picture of his average day. We are urging that the overall visual acuity of an inmate be the test for the future. As a member of this bench mentioned, there is an aging population that is becoming larger with each passing year and is presenting great challenges. And I understand that economics are not an issue when it comes to compliance with the Constitution. But nonetheless, the Constitution, like in so many areas, does draw lines. And here we have an inmate who has 20-20 vision with corrective lenses and has Out of the good eye. Out of his good, correct human eye. Now, just to understand the case here, and with the bad eye, is he blind? Yes. Period. Okay. So just one good eye correctable to 20-20, the other eye blind. Got it. Correct. It did progress over years. But there's no question that he cannot see out of that eye. And do we have anything in the record that tells us how bad the eye vision was in the bad eye over time? I'm, among other things, trying to feed into Judge Bybee's question about running his hand through the sewing machine. I mean, was the bad eye still to some degree serviceable five or six years ago? What do we know about that? Well, we have a somewhat clouded picture, because he decided not to appear for his annual physical examination for a period of approximately six years. He was upset with the medical department. We do know that early on in the diagnosis, he did have the cloudy vision that many who suffer from cataracts do report. By the time that he experienced these incidences during the course of his job, the record strongly suggests that he was essentially blind in that eye. Right. But the thrust of Judge Bybee's question was, well, if he was totally blind beginning in 2002, the inference that he's putting his hand through the machine in 2010 because of his blindness would be that, well, no, there may be other causes because he operated the machine successfully for eight years. On the other hand, if it was progressive and the vision out of the bad eye was pretty good in 2002, pretty bad in 2006, and gone by 2010, that's quite another question. Agree. But, you know, we take a different point of view. Someone who was working with a machine such as a sewing machine in a large industrial factory who only sustains two injuries over a long period of time, that's pretty remarkable. When were both of the injuries fairly close together in time? Remind me of the dates of those injuries. I can state from the record they were within 18 months of each other or so. And do you remember offhand the precise dates? If you don't, we can look it up. I don't, but I know that during his deposition at page 23, he said such things as, I just know much of it, and that was the bumping of his head and bumping into others and his experiences during the work. He said, and I quote, much of it is just being senile and old, you know, but it happens. He has not had any problems in the prison. I didn't hear you answer Judge Fletcher's question. So his question was, how bad was his cataract in 2002? How bad was his cataract in, let's pick a date, 2006? How bad was the cataract in 2010 when the incidents occurred? In 2002, the record would suggest that he had impaired but some vision in his eye with the cataract. In the, there was a six-year period where we don't know because he didn't present himself. By 2010, he was essentially blind in that eye. And the record suggests, and I can't give precise dates, but his blindness in that one eye probably had been present for at least three years prior to 2010. The eye was barely functioning when it was first diagnosed. Again, I don't think there's much question about that. So roughly the State believes that he's been blind since 2007. So, okay. Now, same questions that I asked Counselor, Mr. Caldwell. Do we know, do we have anything in the record or anything in the public record that suggests what the policy towards cataracts is in other States? Well, we know, for example, in Virginia, it is the overall visual acuity, which is the standard that we are urging and is essentially a different statement of the medical directive that the Nevada Department of Corrections uses. And that is, when we take into account what an inmate can do with his good functioning eye, can that inmate perform average daily living activities? Now, my esteemed colleague and opponent has mentioned that a physician has recommended that cataract surgery occur. Yes, there wouldn't be a competent ophthalmologist in the country who wouldn't look at a patient who presented himself to that doctor and saw an eye that had a cataract that totally blinded that individual who would not recommend cataract surgery. But the recommendation of a medical treatment is not the standard under the Eighth Amendment. Right. Now, you said that the Virginia standard is overall visual acuity. Yes. Which is the standard that you're proposing. But overall visual acuity doesn't really tell me very much because that's a very general standard. And it seems to me consistent with the language, overall visual acuity, if someone is totally blind in one eye, which means that you can be blindsided. That is to say, coming from this side, if that's where my blind eye is, I can't see anything coming at me. If I only have one eye, that means my depth perception is gone. It may very well be that my overall visual acuity is so reduced that cataract is appropriate. Can you tell me if Virginia has what I'll characterize in kind of colloquial terms as a one-eye policy? Well, again, they do it within the confines of the total visual acuity standard. And in applying that, they ask the question, to what extent can the inmate function in a normal fashion with this particular eyesight limitation? We know that individuals adjust. But I think you're avoiding answering my question directly because you don't know the answer. But let me ask it again. Does Virginia have a one-eye policy? As stated, they do not. They don't state the phrase one-eye standard. Okay. Now, let me ask you this, and perhaps I could, it's in the record and I don't know. How do we know from the record, or how much do we know from the record about Virginia's policy? Nothing. I don't know why we're talking about Virginia's policy. Well, I mean, I cited cases from Virginia. That's all we know is what's in those cases. We don't have a copy of a published policy from the Virginia Department of Corrections. No. And we don't know what other states in our circuit have, say, with respect to cataracts, if anything. That's correct, other than references to the federal prison standard, which is similar to Virginia. So what is the federal prison standard? It's basically overall visual acuity. And what does that mean? An inmate can perform average daily living activities, eating, sleeping, working, exercising, functioning. Yeah, yeah, I know. But does that mean they have a one-eye policy? Functionally, yes. Now you say functionally, how do you know that? Because the standard allows the prison system to not necessarily provide cataract surgery to an inmate that is blind in one eye. Now, you say that's the federal policy. What do we have in the record that tells us what the federal policy is with respect to a one-eye policy? Only the cases that make a reference to the fact that they are tracking or paralleling the federal system. So in other words, we don't really know whether the federal system has a one-eye policy. We only know of other judges who have written in their opinions that they are tracking the federal policy, the federal prison policy. That is correct. It didn't come up in the district court case. It is not per se in the record below. Is there a model code for prisons dealing with this issue? No, there is not. Not that I know of. Is there a model code at all, just one that doesn't have a visual policy, or there's no model code? There's no model code for cataracts that I know of. And there is certainly not one that was cited in the record. Yes. Now, I understand your point, and you quite properly made the point. In fact, it's almost a concession on your side, which is to say that budgetary constraints don't excuse a State from failing to comply with the constitutional standard. Correct. Nonetheless, I think cost may figure in to some degree so that, for example, if someone has a very badly infected toe that he can walk around and so on, but it's very painful that the State could treat at a total cost of a dollar, my guess is that we would constitutionally say they've got to provide the treatment for a dollar that will relieve him of this very painful condition. Having said that, I don't quite know how it cuts. Do we have figures as to how much a cataract operation on a single eye would cost the State of Nevada? I believe the cost is somewhere between $10,000 and $12,000. $10,000 and $12,000? I believe so. Is there anything in the record that says that? No. I'm basing that on the bill that my wife got recently for some surgery. Oh, listen. I know. I know. If the bill was sent to your wife from the hospital independent of insurance, we can be confident that it was an outrageously expensive bill that the hospital did not expect to collect. Right. I would agree. And it probably could be done at a small fraction of that cost. If Mr. Colwell had family with adequate means to secure this operation, would he be permitted to fund his own operation? Yes. And we have inmates who do get permission to obtain outside treatment. We have one right now who has hepatitis C, and his family wishes to engage in alternative medical treatment for that inmate. And they are paying for it, and we allow it. Yes. And this may not be, again, may not be strictly relevant, but you mentioned, and I'm quite sympathetic to the State on these points, that the State of Nevada, as all states, has an aging population. Well, I'm sympathetic to the State of Nevada. On the other hand, I want to say it's Nevada's choice to have a rapidly, to have an aging population in prison. I mean, it's you guys who put them in there for life. And coming with that is a certain level of responsibility. It is the conundrum we face. Our citizens want to be tough on crime. They want three strikes and out. They want long prison sentences. But then they don't always want to fund the prisons and the money that is necessary to allow them to function. Nonetheless, as we concede, the Constitution says you must provide certain forms and levels of care. We do the best we can. Yes, the State has accepted that responsibility. Yes, we are in Corrine's control. And for purposes of the case as it is now before us, do you accept the testimony or evidence in the record that his having sight out of one eye is causing problems such as running into inmates with possibility of altercation, hitting his head on the bunk bed, hitting his head on a concrete ball, running his fingers through the sewing machine? We concede that those events occurred. We don't concede that it's because of his eye. Now, he says that they did. Well, he also says, I'm getting old and I'm getting clumsy, and I can attribute it to that, too. I don't think that two incidences of injuring yourself on the job while operating a sewing machine over nine years necessarily attributes that to vision. But he seems to attribute it at least in part. He does. Yes, and I don't think you've got any evidence to the contrary. Other than his statement, he himself somewhat offers an alternative reason. Well, a contributing reason, I would say. Contributing, yes. Okay. And, you know, in that regard, people bump into people. It's a very crowded system. You know, it is not unusual for many inmates with two eyes to bump into each other and to bump into things. It is a small, cramped living space. People do learn how to compensate, and I think he has very well. And that really is the standard. He enjoys a very rich life to the extent that one can in prison. And you've seen the chronicle of his daily life from the morning he wakes up until the time he goes to sleep. He's discovered the secret of doing hard time well. Keep busy and do things that are not violative of the law. And from worshipping to exercising to playing cards to socializing to eating and to working, he does all of those things extremely well. Okay. Thank you very much. Thank you, Your Honor. Now, we took the State over time. We took you over time by a bit with our questions. So why don't we put the four minutes, the full four minutes back on the clock? May it please the Court, Your Honors. My name is Mason Bolling. I'm also representing the appellant in this case, John Caldwell. A couple of points on rebuttal. First, I want to clear up some inconsistencies in the statements so far. You can see at the medical records and the excerpts of record at page 225 that since 2003, prison officials have noted that Mr. Caldwell has no vision in his right eye. So he has been blinded in his right eye since at least 2003. Does that help you or hurt you? We think it helps, Your Honor, because prison officials have been aware for more than a decade now that Mr. Caldwell has no sight whatsoever in his eye. And it was very shortly within this finding, actually, that they discovered that he had run his hand through a sewing machine twice. So on what dates did he run his hand through the sewing machine? That's at page 233 of the record, Your Honor. Hang on a second. Hang on a second. Volume 3. 233. Okay. So when did this happen? And so this is September of 2003. And what the notes say is that he has run his hand through a sewing machine twice and that he needs two good eyes. I see. So date of request is 2003. Patient has run his hand through a sewing machine twice this past ten months. I see. Right. Okay.  Yes, Your Honor. And then, again, in 2009, when the second request was made, at page 221 of the record, you can see the treating ophthalmologist writing that the cataract continues to cause Mr. Caldwell to have trouble working. That's at the top of page 221. Let's go back to the incident. So that was dated 2003, and that was the medical report. How long did he continue to work in the sewing project? Not long thereafter, Your Honor. He was removed from that job, but for reasons unrelated to his medical needs. And so he's no longer in danger of running his hand through a sewing machine. No, that's right, Your Honor. But, again, in 2009, at page 221 of the record, you can see the ophthalmologist still saying that he has trouble working because of his lack of vision. So I'm on 221. This is handwriting. I'm having trouble deciphering it. So what are you pointing me to? At the very top of that page, in the far left column, you can see that it's dated 12-4-09. Yes, uh-huh. And then, or excuse me, it's the following page, 222, Your Honor. 222, okay, I'm with you. It's dated 10-5-09. Okay. And then the description is optometry. And on the third line, it says, after noting on the top line that he has a mature cataract in his right eye. Having trouble working, okay. Got it. And then, secondly, Your Honors, I'd like to explain a little more about what overall visual acuity might mean. The defendants acknowledge in their brief that a policy that is divorced from the underlying medical condition would be constitutionally deficient. And we submit that an overall visual acuity standard is just that, totally unrelated to the medical need because it's essentially a one-eye only policy. If an inmate can see out of one eye, that's sufficient. And even Virginia, as stated in the case Thomas v. Stevens in unpublished district court opinion, they don't just look at overall visual acuity. They consider specifically the degree to which the eye that's suffering from the cataract has been diminished. And so it's not just what can the other eye do, but it's also how bad is the eye with the cataract. And so in this case, it can't get any worse. It's totally blind. He has light perception only in his right eye. And you can see prison officials in this case putting this visual acuity standard into practice. At page 221 of the record, for instance, Dr. Gedney, this is towards the middle, the report dated 2-18-10 on the far left-hand column, second report dated 2-18-10. Dr. Gedney writes that he advised the patient that his cataract request is discontinued because he has vision out of one eye and therefore doesn't meet the criteria. And on page 222, Dr. Scott writes on 10-13-09, this is at the bottom half of that page, that he submitted the request because of the recommendation of the optometrist. In fact, he says it was based purely on the consult with the optometrist. But once he discovered that Mr. Caldwell's left eye was correctable to 20-20 with glasses, he discontinued the consult. And although these two statements don't explicitly invoke the phrase one-eye policy, Mr. Caldwell swears in his complaint at page 200 of the record under penalty of perjury that Dr. Gedney told him, I don't meet the criteria because the criteria is one good eye, no surgery. Okay, good. Now, we've now taken you over your floor. Yes, Your Honor. I thank you for your time. And we ask that this Court reverse and remand. Thank you very much. Now, before we take this case under submission, I would like to say on behalf of the Court that we are very grateful for pro bono projects that provide representation at this stage. I'm not in thanking the students from the University of Arkansas in any way signaling how we're going to come out on the merits. But I would like to express our appreciation for a job very well done. Caldwell v. Manister now submitted for decision. Thank you.
judges: Silverman, Fletcher, Bybee